United States District Court

Eastern District Of North Carolina

Western Division

File No. 5:11-CT-3244-F

1 page of 24

FILED

DEC 3 0 2013

JULIE A. RICHARDS, CLERK
US DISTRICT COURT, ED. NC
BY_____ DEP CLK

| | |
|---|---|
| Roylin Junius Beale, | Plaintiff's Response In |
| Plaintiff, | Opposition To Defendants' |
| v. | Motion For Summary |
| Deputy J. P. Madigan, et al. | Judgement |
| Defendants | |

NOW COMES plaintiff, Roylin Junius Beale, proceeding Pro Se, and hereby Respectfully submits his Response in opposition to defendants' Motion for summary Judgement.

## STATEMENT OF THE CASE

This case was instituted by the filing of a complaint by the plaintiff on Nov. 13, 2011, in the United States District Court, Eastern District of North Carolina, Western Division, against defendant Deputy J. P. Madigan. Plaintiff alleges that he was subjected to an excessive use of force by way of tasing while he was handcuffed behind the back and in the presence of four (4) other officers. Plaintiff further alleges that, after the initial deployment of the taser, he was then taken down to the ground and tased twice more by way of drive-stun.

Plaintiff's complaint alleges that officers B. Blow Jr., Peele, Harless, and Corprew were deliberately indifferent and in violation of his constitutional Rights. On April 23rd, 2012, this court entered an order concluding the frivolity Review and directing the clerk of court to maintain management of the matter.

Subsequently, on June 6, 2012, plaintiff filed a motion to amend to add additional defendants and seeking discovery materials. On August 29th, 2012, plaintiff filed a motion for default judgement against Deputy Madigan. On October 25th, 2012, this court entered an order granting plaintiff's motion to amend his complaint but denying his motion for discovery and entry of default judgement.

Plaintiff filed an amended complaint on November 13th, 2012, adding defendants R. Blow Jr., Deputy Harless, Officer Peele, and Captain Phillips. On February 4th, 2013, Deputy Madigan, Officer Blow, Deputy Harless, and Officer Peele filed an answer and defenses, and defendant Phillips filed a motion to dismiss. On the same day, plaintiff filed a motion for the appointment of counsel. On April 30th, 2013, this court entered an order granting defendants' Phillips' motion to dismiss for failure to state a claim and denying plaintiff's motion for the appointment of counsel. The parties engaged in discovery and on October 24th, 2013, plaintiff filed a motion, for the second time, to amend his complaint, due to newly discovered information pertaining to the addition of an additional defendant.

As of the filing of defendants' motion for summary judgement, no order has been issued on plaintiff's motion to amend. This court entered a scheduling order on November 1st, 2013, and, in light of the deadlines set fourth in that order, plaintiff filed a motion for an extension of time in order to have time to recieve discovery and file the proper motion. On December 9th, 2013, defendants filed a motion for summary judgement along with the affidavits of J. P. Madigan, Andrew J Peele, B. W. Harless, Robert E. Blow Jr., Thomas Corprew, Tameka Sneed, Charles B. Craft, Mark A. Stokes, Robert Webb, Joseph Allen, Nichelle Moore, Bobby Bowden, Natoya Bullock, Melanie Perry, and John Combs.

Plaintiff now files this response in opposition to defendants' motion for summary judgement.

As to the incident that occurred on February 19th, 2011, it is undisputed that plaintiff was arrested and brought into the Pitt County jail. It is disputed, however, that plaintiff was intoxicated during the course of the arrest, where there were no breathalyzer test administered to prove such assumption. Plaintiff was ultimately handcuffed and arrested for being in possession of a stolen vehicle. On the way to Deputy Madigan's vehicle, plaintiff demonstrated a level of resistance by not wanting to walk and attempting to pull away. That level of resistanced forced Deputy Madigan to use appropriate force by pushing plaintiff to and inside of the patrol vehicle.

Plaintiff became agitated and angry, cursing at and threatening Deputy Madigan. While in route to the jail, both, Deputy Madigan and plaintiff exchanged insults. Never did plaintiff make the threat of "Murdering" anyone. Even when plaintiff arrived at the detention center he continued to use abusive and insulting language towards Deputy Madigan. Despite that fact, it required no force to get plaintiff inside of the jail. Once in the pre-booking area, plaintiff began arguing why he was wrongly arrested. Deputy Harless asked plaintiff to sit on a stool behind the desk and plaintiff refused. Plaintiff and Deputy Harless engaged in a verbal confrontation which then led to Deputy Harless becoming angered and attempting to force plaintiff onto the stool. This enraged plaintiff and plaintiff snatched away from Deputy Harless' grasp.

Deputy Harless then decided that he needed assistance and alerted booking. Shortly after, officers R. Blow Jr., and Corprew arrived on the scene. Plaintiff was still refusing to obey any orders at this time and officer R. Blow Jr. tried to talk plaintiff into doing so. Plaintiff continued to refuse orders and stated that "He wasn't doing anything until he made his phone-call". Officers Peele, Blow, Corprew, and Harless then grabbed plaintiff and proceeded

to drag him into a secluded room. Plaintiff attempted to resist by locking his legs and pulling away, but to no avail. The officers overpowered plaintiff and easily escorted him to the room. Once there, defendants tried to undress plaintiff but plaintiff resisted by swinging his arm/shoulders to prevent the officers from getting a hold of him. Plaintiff was then tased by defendant Madigan and slammed on his face by the other officers. While being held on the ground in a face-down position, with his hands still cuffed behind his back, plaintiff was tased twice more by way of drive-stun, resulting in plaintiff being rendered unconscious. Plaintiff was awakened by the administering of an amonia stick from a nurse. Never did the nurse check any of plaintiff's vital signs or conduct any other evaluation of plaintiff's injuries. Plaintiff was still handcuffed at this point.

# ARGUEMENT

Pursuant to Rule 56 (a) of the Federal Rules of Civil Procedure, the court shall grant summary judgement if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgement as a matter of law. In light of this rule, plaintiff will proceed to show proof supporting the fact that there is, however, a genuine issue of material fact and that the movant is not entitled to judgement as a matter of law. Plaintiff presents these facts pursuant to Rule 56 (c)(1)(A), citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. To withstand a summary judgement motion, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of material fact for trial, and hereby plaintiff argues:

## 1). The Force Used Against Plaintiff Was Excessive And Subjected Plaintiff To The Unnecessary And Wanton Infliction Of Pain

In plaintiff's complaint, he alleges that he was subjected to excessive force by way of taser while he was standing, handcuffed, and surrounded by four other trained officers. (Officers R. Blow Jr., Harless, Peele, and Corprew). Plaintiff also asserts that excessive force was further used while he was face-down on the ground, with his hands cuffed behind his back, and Deputy Madigan tased him twice more, despite the fact that there were no immediate threat to him or any other officer. Defendant Madigan tased plaintiff for a duration of 36 seconds, (See Exhibit E (3) - Page # 6), which resulted in plaintiff losing consciousness. (See Exhibit C (2), C (6)(b), and C (4)(c)). Defendant Madigan's conduct violated plaintiff's fourteenth (14) amendment right, where plaintiff was subjected to the "Unnecessary and Wanton infliction of pain and suffering". See Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

In evaluating such a claim, the question whether the measure taken inflicted "Unnecessary and Wanton Pain and Suffering" ultimately turns on whether the force was applied "In a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm". (See Orem v. Rephann, 523 F.3d at 446.) In determining whether an official acted maliciously and sadistically, the court should consider: (1) The need for the application of force; (2) The relationship between that need and the amount of force used; (3) The threat reasonably perceived by the responsible officials; and (4) Any efforts made to temper the severity of a forceful response. But this analysis requires consideration of whether the given situation required the use of force, the relationship between the need and the amount of force used, the extent of pain inflicted, and whether the force applied was in a good-faith effort to maintain or restore discipline or malic-

iously and sadistically for the very purpose of causing harm. *Orem v. Rephann*, 523 F.3d at 446.

In the instant case, plaintiff, like *Orem*, was handcuffed behind the back when tased several times. But, unlike *Orem*, plaintiff's excessive force claim didn't take place inside of a police car, rather, it took place inside of a jail. There's almost no distinction in the instant case and *Orem*. Therefore, plaintiff believes that *Orem* is very instructive in the court's decision for defendants' motion for summary judgement, in light of the facts presented.

Plaintiff contends that the force used inflicted unnecessary and wanton pain and suffering. He demonstrates this truth by pointing out the obvious fact of him being handcuffed behind the back, nonetheless surrounded by four (4) other trained officers. Considering these two important factors and how they militate against Defendant Madigan's actions, any reasonable person would acknowledge that the force used was "Unnecessary" and "Wanton" and "Not in a good-faith effort to maintain or restore discipline", but rather, "Maliciously and sadistically for the very purpose of causing harm". According to the "Use of force Continuum", officials should consider the circumstances with regard to "Personnel-to-Offender size and strength", "The number of Offenders", "The availability of back-up personnel" and other factors. (See *Exhibit B - Page #12 - Use of Force Continuum - Paragraph #1 and #2*).

In this situation, there were only "One" offender, and that offender was a man with a height of 5'9" and a weight of 210 pounds. The total number of personnel was that of five (5). All of the officers were taller than plaintiff, other than Deputy Harless and Officer R. Blow Jr. Each officer presumably weighed more than plaintiff or were, perhaps, 195 pounds individually. Plaintiff was restrained in handcuffs behind his back and there were, at minimum, five (5) more officers in close proximity who could've served as

back-up if there were ever a need for greater assistance. Furthermore, the type of resistance that plaintiff presented only required "Soft Empty Hand Control Techniques". (See Exhibit B - Page #7 - Levels of Non-lethal Control (1) (b) - Soft Empty Hand Control Techniques). As an officer employed by the Pitt County Sheriff's Office, each defendant mentioned herein was trained to handle resistive subjects using non-lethal control, so to say that five (5) trained officers, combined, weren't able to handle "One" person, who was handcuffed behind the back, without the use of a taser, is nearly misconstrued as so sort of joke. The fact that the taser was utilized "Multiple times" is, clearly, enough to shock the "Conscience of Mankind."

In Defendant Madigan's incident report, he described plaintiff as "Ranting", "Raving", and "Cursing" on the night of his arrest. (See Exhibit C (1) - Page #2 - Paragraph #1). He later describes how plaintiff became more verbally and abusive when he approached him to take him into custody. He also noted how plaintiff had to be "Physically Moved," with no force other than pushing him to the patrol vehicle. (See Exhibit C (1) - Page #2 - Paragraph #2) Never did plaintiff threaten physical harm to defendant. The same resistance that plaintiff presented throughout his arrest was the same that he presented throughout the entire ordeal. Never did any one of the officers' statements mention that plaintiff attempted to assault them. They all simply alleged that plaintiff was resistant by swinging his shoulders and legs in an effort to prevent them from undressing him. This level of resistance is called "Defensive Resistance", (See Exhibit B - Page #5) And according to the "Use of Force Continuum" of the Pitt County Sheriff's Operational Manual, Soft Empty-hand techniques or hard empty-hand techniques are to be used to control a "Defensive Resistant" inmate. (See Exhibit B - Page #12 - Use of Force Continuum (1)(B)(c)).

An interesting inquiry would be "If defendants were able to handle plaintiff and overpower him enough to drag him to a dressing room, how then, was it that once they were inside of the dressing room defendants weren't able to maintain control of plaintiff?" An even more interesting inquiry would be," Why weren't five (5) trained officers able to handle "One" restrained person without the use of a taser?." Considering defendants' capabilities, it's apparent that this situation was manageable without the use of a taser. Officer Corprew's statement provides that he yelled, "let's take him to the floor". In making this statement, it shows that this particular technique is one that would render a handcuffed person, defenseless. (See Exhibit C⁽ˢ⁾-Page #2). As the officers attempted to execute the takedown, Deputy Madigan yelled "Taser" and deployed it into plaintiff's back. (See Exhibit C (1) - Page #3). In defendants' statements, it's said that plaintiff was shot in the chest/abdomen region with the taser, but the facts show differently. First of all, if plaintiff was shot in the chest, it would have to mean that plaintiff was facing defendant Madigan. Secondly, in order for plaintiff to bust his eye on the floor, he would have to hit his "face" on the floor, and that would require a "Forward Fall", not a "Backward Fall". Third, a "Foreward Fall" would place plaintiff "Directly" up against defendant, being that defendant claims he was "Three (3) feet away from plaintiff when he discharged his taser", and plaintiff is a height of 5 foot 9 inches. And lastly, if plaintiff was that close to defendant, "After the takedown", why then, was plaintiff tased twice more on the "Thigh", and "Calf" when there were other body parts closer and more accessible? Orem v. Rephann (Considering his reach was closer to her right side and other parts of her body, a reasonable jury could also infer that Deputy Rephann's application of force in these areas was done for the very purpose of harming and embarrasing Orem.) 523 F.3d 442 (4th. Cir. 2008)

Plaintiff only point out these facts to show the discrepancies of defendants' statements. The truth is, *"Plaintiff was shot in the back with the tazer, slammed on his face and tased twice more by way of drive-stun to the thigh and calf."* Plaintiff was incapacitated after the first shot, (See Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010) ("According to the manufacturer, the probes do not need to penetrate the skin of the intended target to result in a successful connection. The probes are capable of delivering their electrical charge through up to two (2) inches of clothing.")) So to say that plaintiff was still resisting is absurd. Defendant Madigan didn't even give the other officers an opportunity to execute the takedown. As soon as officer Corprew stated, *"let's take him to the floor",* defendant Madigan yelled *"Taser"* and shot plaintiff. (See Exhibit C (5) - Page #2). Deputy Madigan was so upset and eager to cause harm to plaintiff, he seized the opportunity and shot plaintiff, despite the technique that was about to be applied.

Any reasonable person would know that a handcuffed person, face-down on the ground, with his hands behind his back, is defenseless and pose no level of threat to anyone. Nor can this person stand up without the assistance of another. Therefore, if the defendant didn't know that the force he had already use was excessive, then he definately knew that any other force by taser was *"Unnecessary".* Disregarding that knowledge, defendant Madigan chose to satisfy his need to cause harm and humiliation to plaintiff by drive-stunning him in the location of his upper thigh and calf. According to officer' Corprew's statement, defendant Madigan applied the taser for approximately Twenty-to-Twenty-five seconds, (See Exhibit C (5) - Page #2) but in the printed data from the taser, it documents a duration of *"Thirty-Six Seconds",* (See Exhibit E (3) - Page #6) and that alone should be enough to corroborate plaintiff's assertion of excessive force that inflicted the unnecessary and wanton

pain and suffering.

Due to plaintiff's refusal to submit to officers' demands and his resistive behavior, there was clearly a need for the application of force. Plaintiff doesn't dispute that. What plaintiff disputes is "The relationship between that need and the amount of force used." In relying on the "Pitt County Sheriff's Operational Manual," it's prohibited for an official to use a taser weapon on an "Unarmed", "Shackled", or "Handcuffed" person. (See Exhibit B - Page #18-19 - "Guidlines for the use of any electronic control weapon"). Undoubtedly, the situation could have been handled without the use of a taser, but rather, with the use of "Open Hand Techniques" as required by policy. The use of taser under these circumstances shows the motivating factor to be one of ill-intent. If that's not enough, then clearly, the duration of the tasing shows an evil motive.

Tasers are "Programmed to give a 5-second electrical current. The operator can shorten or extend this time..." (See Exhibit B - Page #20 - "Guidelines for The Use Of Certain Brands Or Types Of E.C.W." - (a) Taser (1)). Considering how long defendant tased plaintiff, it's clear that the "5-second electrical current" was extended. In fact, that "5-second electrical current" was extended "Seven times five". In "Oliver v. Fiorino", 586 F. 3d 898, 903-04 (11th Cir. 2009) decedent "died as a result of 'ventricular dysrhythmia in conjunction with Rhabdomyolisis' as a result of 'being struck by a taser at least eight times over a two-minute period'.") In the instant case, plaintiff is to be considered lucky. He, too, was tased almost eight times over a two-minute period. The risk of that degree of tasing is clear and any reasonable officer should have foreseen the potential danger in such act. The Supreme Court achnowleded that "One need not have personally endured a taser jolt to know the pain that must accompany it." Lewis v. Downey, 581 F. 3d 467, 475

(7th Cir. 2009).

In regard to the threat reasonably perceived by defendants, plaintiff's language, aggressive behavior, and repeated disregard of orders only shows plaintiff as a disgruntled, and angry individual. In "Bryan v. MacPherson", the 9th Circuit held that "although Bryan's "volatile", "erratic conduct" could lead an officer to be wary, it did not, by itself, justify the use of significant force." Plaintiff was angry for being arrested and not being able to make a phone call. Plaintiff never threatened or attempted to assault anyone. Therefore, there were no threat of imminent danger that would've required the use of a taser. Even when force was used to escort plaintiff, he merely attempted to lock his legs and not walk. Once inside the dressing room he refused to allow the officers to undress him. Plaintiff's hands were cuffed behind his back, so all he could do was "swing his shoulders back and fourth in an attempt to not allow the officers to get a firm grip".

Even before the defendants attempted to escort plaintiff to the dressing room, Deputy Madigan had already made the decision to tase plaintiff. (See Exhibit C (3) - Page #2 - "Deputy Harless' Statement") ("I saw D/s Madigan un-holster his taser and place it out of view from Beale (plaintiff)"). Also, see Exhibit C (5) - Page #1 - "Officer Cordrew's Statement") ("While inmate Beale (plaintiff) was talking irately, I saw Deputy Madigan draw his taser and conceal it behind his back, out of the view of inmate Beale (plaintiff)." ) It forces one to inquire, "Why hide it if your intentions were to restore discipli- ne?." It was feasible to give a warning that the use of force by way of taser was imminent if plaintiff didn't comply, and even though a warning may or may not have caused plaintiff to comply, "There was ample time to give that warn- ing and no reason whatsoever not to do so." Deorle v. Rutherford, 272 F. 3d at 1284. See Jackson, 268 F.3d at 655 (Finding that the officer's "safety

"interest" increased further when the group was warned by the police that a chemical irritant would be used if they did not move back. . . And the group refused to comply").

Plaintiff further contends that the threat percieved by defendants "R. Blow Jr.", "Harless", "Peele", and "Corprew", was minute being that they used "Soft Empty-Hand Techniques" by carrying plaintiff along to a pre-determined destination when he refused to walk. And taking that fact into consideration, I believe that the proper determination is that the level of threat percieved by the detention center officers was one requiring a low level of force. Another fact to consider is that they, too, just as Deputy Madigan, were equipped with tasers, so if the threat were percieved by those officers to be of a higher degree, then they would've used a higher degree of force. . . like tasing plaintiff. But, strangely, the only one to percieve an imminent danger was Deputy Madigan.

With respect to efforts to temper the severity of the response, plaintiff points out that defendant Madigan had ample time to warn plaintiff about the use of the taser after pulling it out and hiding it behind his back. One can conclude by analyzing Deputy Madigan's actions, that he was anticipating tasing plaintiff so that he could punish him for all of the insults he stated towards him. Not only did defendant Madigan tase plaintiff once, he tased plaintiff "Three" times, and during one of those times he tased plaintiff for a duration of 36 seconds, only ceasing when plaintiff loss consciousness. Such acts significantly demonstrate that Defendant Madigan acted with a malicious and sadistic intent and for the sole purpose of causing harm. Thus, under the factors set fourth in "Whitely", supra, defendant Madigan's use of force, specifically the tasing and the two drive-stuns, weren't for a legitimate purpose in protecting himself or the other officers, and therefore constituted

EXCESSIVE FORCE.

Based on the foregoing, it is clear that defendant Madigan did apply force "Maliciously and Sadistically for the very purpose of causing harm", while inflicting "Unnecessary and wanton pain and suffering" to plaintiff. Thus, after balancing the Whitely factors, and based on the exhibits presented, plaintiff submit that defendant Madigan has failed to prove that there is no genuine issue of material fact and that he is entitled to judgement as a matter of law. And therefore, plaintiff respectfully ask that the court deny summary judgement and allow this case to proceed to trial.

## 2). Deputy Madigan Is Not Entitled To Qualified Immunity

As set fourth above, plaintiff contends that defendants aren't entitled to summary judgement due to the facts stated, proving that defendant Madigan violated plaintiff's constitutional rights by using excessive force and inflicting unnecessary and wanton pain and suffering. Furthermore, plaintiff argues that defendant Madigan, as well as the other defendants set fourth in this claim, aren't entitled to Qualified Immunity, being that, during the time when the violative conduct occurred, the statutory and constitutional rights of plaintiff were "Clearly Established", and a reasonable officer would have known the conduct to be unlawful.

Government officials performing discretionary functions "are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Considering that all defendants mentioned

herein are employed by the Pitt County Sheriff's Office, it shall be an undisputed matter whether they recieved a copy of "The Pitt County Sheriff's Office Operations Manual" upon their employment. Therefore, it shall also be undisputed whether or not these defendants were fully aware of "Policy and Procedure" as pertaining to the "Use Of Force" and "Electronic Control Weapons". (See Exhibit B). Being that each defendant involved carried a taser, it's proper to conclude that they recieved "Training" and were "Certified" to carry. (See Exhibit B - Page #18 — "Authorization To Carry And Use.") ("Subsequent to the initial E.C.W. training and certification course, annual refresher training shall be conducted for all members authorized to carry and use an E.C.W.")

During this training, I assume that officials are taught what to do and what not to do in various situations. And according to "Policy", officials are trained "Annually." This information makes it clearly that defendants should have known the "Guidelines" to follow for the use of taser weapons. To be more specific, defendants should have known that the "Guidelines" clearly instructs the reader to "Never use a taser on an unarmed, shackled, or handcuffed" person, (See Exhibit B - Page #19 (K)) and by blatantly committing an act contrary to that rule, defendant Madigan showed a callous disregard to "Clearly Established Statutory", thus violating plaintiff's "Clearly Established Constitutional Right", to be free from excessive force. Plaintiff was already handcuffed and surrounded by four (4) other trained officer, there were other officers in close proximity who were easily accessible via walkie-talkie, and soft empty-hand techniques were being employed. So, there were obviously no reason whatsoever for Deputy Madigan's use of force by taser. Even after the first shot, plaintiff was incapacitated and taken down. With all of the training these defendants undergo, "Annually", clearly, the "New Circumstances" gave them an even greater advantage over plaintiff. But apparently Deputy

Madigan disregarded this incredibly handicapped situation and decided to do as he desired by drive-stunning plaintiff on the thigh, incapacitating plaintiff further. Plaintiff's screams must have excited Madigan because he moved the taser from plaintiff's thigh to plaintiff's calf. Plaintiff doesn't remember anything that happened afterwards but him waking up to a nurse holding an amonia stick under his nostrils. Plaintiff points out the fact that a person handcuffed behind the back and lying face down on the ground is defenseless. There's absolutely "Nothing" that can be done to harm another and officers would have "full control" over whomever is in this situation. So, to say that the excessive force at this point is justified due to plaintiff's "Active Resistance" and "fighting" is absurd. Those two terms are greatly misleading and false. Moreover, nothing can explain the extremely excessive amount of time that defendant Madigan tased plaintiff.

Although there is no requirement that plaintiff suffer "Serious" or "Significant" pain or injury to demonstrate that a "Malicious or Sadistic use of force was employed", he must allege "More than a de minimis pain or injury". Norman v. Taylor, 25 F.3d 1259, 1263 n.4 (4th Cir. 1994). However, a de minimis injury may amount to an 14th Amendment violation if the force used was of the sort "Repugnant to the conscience of mankind", or the pain itself is such that it can properly be said to constitute more than a de minimis injury. (Norman, 25 F.3d at 1259, n.4 (4th Cir. 1994). In Orem, the 4th Circuit recognized that Orem's injury constituted of far more than a de minimis injury because she experienced electric shock, pain, and developed a scar. Orem v. Rephann, 523 F.3d 442, (4th Cir. 2008). In the instant case, plaintiff's experiences were the same, only, plaintiff busted his eye and was tased for 36 long seconds. In Norman v. Taylor, the fourth Circuit stated:

"We recognize that there may be highly unusual circum-
stances in which a particular application of force will
cause relatively little, or perhaps no, enduring injury,
but nonetheless will result in an impermissible in-
fliction of pain. In these circumstances we believe
that either the force used will be of the sort "Rep-
ugnant to the conscience of mankind" and thus ex-
pressly outside the de minimis force exception, or the
pain itself will be such that it can properly be said to
constitute more than a de minimis injury." 25 F.3d
at 1263, n.4

The 8th Circuit also explained:

"A stun gun inflicts a painful and frightening blow, which
temporarily paralyzes the large muscles of the body, rend-
ering the victim helpless. This is exactly the sort of tor-
ment without marks... which, if inflicted without
legitimate reason, supports the Eighth Amendment's
objective component. Hickey v. Reeder, 12 F. 3d 754,
757 (8th Cir. 1993) (noting that "torment without marks" was
the sort of excessive force claims under the Eighth Amendment
that the Supreme Court was concerened with in deciding
excessive force claims). The district court, thus, properly
rejected Deputy Rephann's claim that Orem's injuries
were de minimis simply because the taser was only
applied for a few seconds."

In Orem, the Supreme Court held that in 2005, "It was clearly Established that an arrestee or pretrial detainee is protected from the use of excessive force." (See, e.g., Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed. 2d 447 (1979). "Because police officers are often forced to make split-second judgements in circumstances that are tense, uncertain, and rapidly evolving, the facts must be evaluated from the perspective of a reasonable officer at the scene, and the use of hindsight must be avoided." Waterman v. Batton, 373, 109 S.Ct. 1865, 104 L. Ed. 2d 443 (1989) (internal citations omitted). Hence, qualified immunity would shield Deputy Madigan from suit if "A reasonable officer" could have believed tasering plaintiff while he was in handcuffs, three times, and for a duration of 36 seconds during one of the instances, was lawful, in light of the "Clearly Established law", and the information Deputy Madigan possessed at the time. Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L. Ed. 2d 589 (1991).

There's no need to conjure up a pseudo - "Reasonable Officer" - because, four other presumably "Reasonable Officers" were at the scene. And indeed, Deputy Harless, who was booking plaintiff and bearing the weight of plaintiff's anger, saw fit to use "Empty-Hand Techniques" by attempting to force plaintiff down onto a stool. When plaintiff refused by snatching away, the two engaged in verbal conflict and Deputy Harless alerted booking, who in turn alerted officers R. Blow, J.R., and Corprew. When they arrived and noticed plaintiff's volatile behavior, they too used "Empty-Hand Techniques" After initially attempting "Verbal Direction", (See Exhibit B - Page #7 - "Levels of Non-Lethal Control" - (1)(a)) which requires no force at all. By this time, Deputy Madigan had already drew his taser and concealed it behind his back. (See Exhibit C(3) and C(5)).

Officer Peele arrived and they drug plaintiff along to the dressing room, despite his struggles of resistance. This fact demonstrates that defendants were capable of controlling plaintiff and that plaintiff weren't able to overpower them. Deputy Madigan was the only one that felt the need to pull out a taser in preparation to use it on a handcuffed person. In fact, according to Officer Blow's statement, while escorting plaintiff to the dressing room, he left the scene to go alert Sgt. Perry that they had a combative and disruptive inmate in booking. (See Exhibit C(4)- "Officer Blow's Statement"). But according to Sgt. Perry's statement, what Officer Blow said happened, never happened. Sgt. Perry state's that "Officers Thomas Corprew and Robert Blow left the processing area and went to prebooking to help". If I must point out, the "Processing Area" is where Sgt. Perry was stationed. She recieved a call "By Phone" telling her that prebooking needed assistance, and considering that she's a sergeant, this implies that she's the one who gave "Corprew" and "Blow" the order to go and assist in the prebooking area. So why would Officer Blow say that he left to alert Sgt. Perry when she's the one who made him aware of the situation? Even if that were the case and Officer Blow needed to alert Sgt. Perry, why would he "leave the scene of a potentially dangerous situation instead of use the walkie-talkie that all the officers were equipped with?" Apparently, the situation wasn't "Dangerous" and plaintiff didn't pose an immediate threat to the officers.

Even when plaintiff was refusing to allow the defendants to undress him, neither defendant utilized their taser weapon. It took Deputy Madigan, who was standing outside of the room, to make the bad decision by seizing the opportunity and firing his taser at plaintiff. Inspired by malice, excessive zeal, and adrenaline, Deputy Madigan then removed the cartridge from his

taser gun and drive-stunned plaintiff while he was face-down on the ground with his hands cuffed behind his back, surrounded by four other officers. Notwithstanding the qualified immunity standard's ample room for mistakes, there is evidence bearing heavily against Deputy Madigan that, in these circumstances, the taser gun was not used for a legitimate purpose; such as for protecting the officers, protecting plaintiff, or preventing plaintiff's escape. Id. at 229 ("The qualified immunity standard's gives ample room for mistaken judgements by protecting all but the plainly incompetent or those who knowingly violate the law." (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092 89 L. Ed. 2d 271 (1986)).

It is believed, in light of the evidence presented, that defendant Madigan used the taser to punish, humiliate, and/or retaliate against plaintiff — a use that is not objectively reasonable, is contrary to clearly established law, and not protected by qualified immunity. A "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." Deorle, 272 F.3d at 1281. In Bryan v. MacPherson, it was held that "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." Id. Rather, the objective facts must indicate that the suspect poses an immediate threat to the officers or a member of the public.

Based on the facts stated above, it is clear that the circumstances, like Bryan v. MacPherson, shows Defendant Madigan being confronted by, at most, a disturbed and upset young man, not an immediately threatening one. And with that determination, plaintiff submits that Defendant Madigan viol-

ated plaintiff's constitutional rights that were "Clearly Established" at the time of this unlawful conduct. Furthermore, plaintiff submits that a reasonable officer would have known that the act was unlawful. There-fore, by law, defendant Madigan isn't entitled to summary judgement on the grounds of qualified immunity and plaintiff respectfully ask that the court deny his motion and allow this case to proceed to trial.

## 3) Defendants Were Deliberately Indifferent To The Risk Of Harm To Plaintiff By The Excessive Use Of Force

The Eigth Amendment requires prison officials to take reasonable pre-cautions to protect the safety of inmates. FARMER v. BRENNAN, 511 U.S. 825, 832-833, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To prevail on a "Failure to protect" claim, plaintiff must show that he was subjected to conditions that posed a substantial risk of serious harm and that jail officials were aware of and disregarded that risk. Plaintiff asserts that defendants "R. Blow, Jr.," "Harless", "Peele", and "Corprew" were all present throughout the entire encounter. In fact, in their statements they write about how they held plaintiff down and undressed him while Deputy Madigan continuously applied the taser to plaintiff's thigh and calf. They attempt to justify their actions by saying that plaintiff was still being resist-ant and that they had to control his arms and legs. In analyzing defendants' assertion, lets not forget that, most importantly, plaintiff was handcuff-ed behind the back. Secondly, plaintiff was face down on the ground and surrounded by four (4) officers who were all trained to deal with resistive inmates. So, to claim that they had to control plaintiff's legs and arms under these circumstances is absolutely frivolous.

There were literally nothing plaintiff could have done to harm anyone while in the position that he was in, and to allow him to be tased twice more without ever attempting to interfere is to be completely indifferent to the risk of harm that plaintiff was subjected to. Nonetheless, plaintiff was tased for 36 seconds. (See Exhibit E (3) - Page #6). Any reasonable person would know that 36 seconds of 1200 volts of electrical current is entirely excessive and runs the risk of seriously harming the victim. Moreover, these officers were well aware of the "Pitt County Sheriff's Operations Manual", (See Exhibit B), where it states that a taser is "Not to be used on a handcuffed, shackled, or unarmed person". They were also aware of how long tasers are programmed to last during each cycle. (See Exhibit B - Page #20 - (a) Taser). These defendants had plenty of time to intervene.

Officer Blow stated in his statement that "He left to go alert Sgt. Perry that they had a disruptive inmate in booking and when he came back, Deputy Madigan had tased him (Plaintiff)". If this is true, then it was at that moment when he should have intervened and stopped the assault. But instead, he immediately began to undress plaintiff while Deputy Madigan held the taser to plaintiff's leg stating "Ya'll better go ahead and do what ya'll gotta do while I got him down".

As to Officer Harless, his statement provides that After plaintiff was drug into the dressing room, he "Stood in the doorway and noticed Deputy Madigan had his taser in the low-ready position, so he stepped into the dressing room and made sure that he was in a position to help but out of the line of fire if the taser was to be deployed." Instead of anticipating the use of the taser on a handcuffed and unarmed person, Deputy Harless should have been warning Deputy Madigan of the penalty of such unlawful

act and encouraging him to follow policy and procedure. To the contrary, Deputy Harless allowed Deputy Madigan to deploy his taser, then drive-stun plaintiff, twice, without once trying to intervene.

The same goes for officers Corprew and Peele. Neither of them tried to intervene and stop the assault, knowing that the act was unlawful according to policy and procedure. By officer Corprew's own admission, Deputy Madigan applied the taser to plaintiff for 20-25 seconds while he removed plaintiff's shoes and socks. (See Exhibit C(5) - Page # 2). In Buckner v. Hollins, the court denied defendants' summary judgement on qualified immunity grounds, holding that "officers have a duty to intervene when inmate is being assaulted because he is in the custody of the jail." Buckner v. Hollins, 983 F.2d 119 (8th Cir. 1993). As far as showing that these defendants were all aware of a serious risk or harm to plaintiff, plaintiff rely on the Supreme Court's acknowledgement that "One need not have physically endured a taser jolt to know the pain that must accompany it." Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009).

In relying on much stronger case law, plaintiff points to "Oliver v. Fiorino", 586 F.3d 398, 903-04 (11th Cir. 2009) ("After being tased at least Eight times over a two-minute period, decedent "died as a result of 'ventricular dysrhythmia in conjunction with Rhabdomyolisis' as a result of 'being struck by a taser'"). Plaintiff could have died as a result of "being struck by a taser for a duration of 36 seconds" which is the equivalent of being tased Seven (7) times at five (5) seconds a cycle. In fact, plaintiff was rendered unconscious by the excessiveness of the taser. (See Exhibit C(2), C(6)(b), and C(6)(c)). The nurse broke an amonia stick under plaintiff's nose in order to have him regain consciousness. (See Exhibit C(2), C(6)(b), and C(6)(c)). The "Use Of Force Polic

for the Pitt County Sheriff's office and Detention Center states: "PERSONNEL ARE obligated to protect persons and property from violaters of the law" (SEE Exhibit B - Page #1 - "Use Of Force Policy - Paragraph #2).

These facts clearly establish how defendants "R. Blow Jr.", "Harless", "Peele", and "Corprew" were deliberately indifferent to the substantial risk of serious harm to plaintiff. And for that, defendants violated plaintiff's constitutional right to be free from the excessive use of force. Plaintiff respectfully ask that the court deny summary judgement as to these defendants due to there being a genuine issue of material fact and these defendants is not entitled to judgement as a matter of law.

NOTE: In defendants' motion for summary judgement, their third principle arguement was that "Plaintiff has failed to show that defendants were deliberately indifferent to a serious medical need." However, that was never one of plaintiff's allegations. In plaintiff's complaint, he simply alleged that defendant's were deliberately indifferent while citing to "Buckner v. Hellins" as a similar claim. Furthermore, everything that plaintiff submitted thereafter clarified what defendants were deliberately indifferent to and it never implied "a serious medical need".

WHEREFORE, in light of the aforementioned reasons, plaintiff hereby respectfully move this court for an order denying summary judgement on grounds of qualified immunity as to all defendants, showing that there is, in fact, a genuine issue of material fact and that defendants aren't entitled to summary judgement as a matter of law.

Respectfully submitted this 24th day of December, 2013

By: _Roylin Beale_
Roylin J. Beale #55357-056

Address: Federal Correctional Complex
U.S.P. Coleman #2
P.O. Box 1034
Coleman, FL. 33521